[No. 33224.   Department Two.   December 15, 1955.]

MINNIE MORK, *Respondent*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Defendant*, GLACIER SAND & GRAVEL COMPANY, *Appellant*.[1]

*Allen, DeGarmo & Leedy*, for appellant.

*Happy, Copeland & King*, for respondent.

MALLERY, J.—George Mork, age fifty-nine, was engaged in extrahazardous employment for the Glacier Sand & Gravel

[1] Reported in 291 P. (2d) 650.

Company for about eleven years. His work consisted of operating handles on sand chutes to let sand out of the vats, swatting the sand screens with a two-pound swatter about every hour, and walking around to watch the operation of the revolving sand screens. His station was on a platform, with a shack on it, about twenty-six feet above the ground, which was reached by a ramp and stairway.

At about 10:45 a. m. on November 17, 1952, Mork went down to the plant office and complained of "gas in the stomach, up to his neck," and said that when he had finished a half day at eleven o'clock he was going to see a doctor. He then walked back up the ramp and stairs to his station, and twenty-five minutes later he was found dead in the shack. He had removed the overalls he was wearing. He had died of an occlusion of a coronary artery, which shut off the blood supply to one half of his heart. He had had a recent hemorrhage into an atherosclerotic plaque in one of the coronary arteries. The atherosclerosis had existed in an advanced stage for several years.

Claimant, Minnie Mork, applied for a widow's pension, which was awarded to her by order of the supervisor of industrial insurance on January 8, 1953. The employer appealed to the board of industrial insurance appeals, which reversed the supervisor on October 30, 1953. The claimant appealed to the superior court of Pierce county. After a trial by jury, the court entered a judgment in her favor. The employer appeals.

The respondent relies upon the deceased's climb from the office back up to his station after he had complained of not feeling well, as constituting the compensable *industrial injury* proximately contributing to his death.

The respondent depends upon the testimony of Dr. Wicks to establish the causal relationship between the industrial injury and the death. His testimony was that the moment of the occurrence of the hemorrhage could not be determined within a number of hours, and it could have happened during the night; that the deceased's feeling of "being filled up to his neck" was a frequent symptom of the

onset of an occlusion, which was probably well advanced when the deceased came down to the office to complain about his condition; that such a hemorrhage does not *necessarily* cause death; that hospitalization and bed rest can, in some instances, afford relief; and that he thought that the deceased's climb back to his station raised his blood pressure and increased the "course" of the hemorrhage. He testified:

"Now, Doctor, do you have an opinion as to whether or not Mr. Mork would have lived at least one minute longer had he not traveled from Mr. Manza up to his shack where he was found dead? A. I believe that if he had not climbed the steps, that he might have lived a little longer, yes."

There was no showing that the deceased did anything strenuous or unusual on the day he died. There is nothing in the record to rebut the conclusion that his death occurred because his disease had progressed to the final stage when he could no longer survive in his way of life.

The act of the deceased in returning to his station is not an industrial accident. As we said in *Higgins v. Department of Labor & Industries*, 27 Wn. (2d) 816, 180 P. (2d) 559:

"There is no sudden and tangible happening in the present case, no matter of notoriety, nor an event which can be fixed in time, but rather an incapacity due to the relatively slow and insidious inroads of a progressive and apparently incurable disease. It is testified that *its progress was accelerated by the character of the work* which appellant did for Du Pont at Hanford, but that falls far short of establishing an injury within the statutory definition with which we are here concerned." (Italics ours.)

Some reliance is placed upon Dr. Wick's testimony that the workman died a minute sooner by reason of climbing back to his station than he otherwise would have. A mere acceleration of a disease by the routine of one's life, is not compensable. *Higgins v. Department of Labor & Industries, supra.*

The burden was upon respondent to prove that the deceased's climb to his station was an industrial injury in

the sense that it was a contributing cause of his death, without which he would not have died when he did. *Petersen v. Department of Labor & Industries,* 40 Wn. (2d) 635, 245 P. (2d) 1161. The theory that an acceleration of death by one minute meets this requirement, is unsound. Even in heart cases, compensability is not predicated upon principles of ordinary life insurance. Death, which is the last stage of a progressive disease, is not within the scope of the industrial insurance act. To be within the act, an *industrial injury* must have a causal relation to the death of the workman, who otherwise would have lived for an indefinite and unpredictable time. Mere acceleration of the final stage of a disease is not proof of the required causal relationship.

The testimony of Dr. Wicks that the workman *would not necessarily* have died if he had been given bed rest when he complained at the office of not feeling well, and had not climbed back up to his station, does not constitute *prima facie* proof that he did not die from his disease alone. Failure to provide the hospitalization that might have saved a man, is not an industrial injury, and bears no causal relationship to an impending death.

Respondent has failed, as a matter of law, to make out a *prima facie* case of causation between the climb and the workman's death. The case should not have been submitted to the jury.

The judgment is reversed.

HAMLEY, C. J., HILL, WEAVER, and ROSELLINI, JJ., concur.

January 27, 1956. Petition for rehearing denied.